IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

JAMES LYDIA,

     *Plaintiff,*

v.                                   Civil Action No. 7:22-cv-149

FEVID TRANSPORT, LLC and
SAND REVOLUTION II, LLC,

     *Defendants.*

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

TO THE HONORABLE JUDGE OF SAID COURT:

     Plaintiff, JAMES LYDIA ("Plaintiff"), by and through his counsel, hereby files this Complaint and Demand for Jury Trial against Defendants, FEVID TRANSPORT, LLC ("FEVID") and SAND REVOLUTION II, LLC ("SAND REVOLUTION") (Collectively "Defendants") for willful violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2(a), 2000e-3 ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and TEX. LAB. CODE §§ 21.051, 21.055 ("TCHRA"), and alleges:

## I.
## JURISDICTION AND VENUE

1. Plaintiff is a resident of Midland, Texas.

2. Defendant, FEVID TRANSPORT, LLC, is a limited liability company formed and existing under the laws of the State of Nevada.

3. Defendant, SAND REVOLUTION II, LLC, is a limited liability company formed and existing under the laws of the State of Texas.

4. The events at issue in this Complaint occurred while Plaintiff was employed by Defendants' integrated joint enterprise at Defendants' Midland, Texas location.

5. This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. § 1331.The Court has supplemental jurisdiction over Plaintiff's claims arising under Texas statutory law under 28 U.S.C. § 1367.

6. Venue is proper in this district and division under 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to this claim occurred in this district.

## II.
## JOINT ENTERPRISE

7. Defendants, SAND REVOLUTION II, LLC, and FEVID TRANSPORT, LLC, were at all relevant times engaged in an integrated joint enterprise where the Defendants maintained significantly overlapping management, personnel, and ownership.

8. Plaintiff and other employees of FEVID performed job duties for the benefit of SAND REVOLUTION.  For example, Plaintiff and other employees of FEVID performed safety training and other job duties for the benefit SAND REVOLUTION.

9. Defendants, SAND REVOLUTION II, LLC and FEVID TRANSPORT, LLC, share common facilities, the same physical address, management, employees, and equipment.

10. Defendant, SAND REVOLUTION II, LLC, provides equipment for oil fields that keeps down dust (used to comply with EPA regulations).  This equipment requires sand.  Defendant, FEVID TRANSPORT, LLC, provides the sand to operate the equipment provided by Defendant, SAND REVOLUTION II, LLC.

11. Defendants, SAND REVOLUTION II, LLC, and FEVID TRANSPORT, LLC, have overlapping management and ownership.

### III.
### EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. Plaintiff exhausted his administrative remedies under Title VII and the TCHRA by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Texas Workforce Commission ("TWC").

13. On or about June 22, 2021, Plaintiff submitted a charge to the EEOC claiming discrimination on the basis of race, color, and national origin as well as retaliation, in violation of Title VII and the TCHRA.

14. Plaintiff timely filed this Complaint upon receiving notices of right to sue from the EEOC.

### IV.
### BACKGROUND FACTS

15. Defendants hired Plaintiff in or around March of 2019 to work as a Health, Safety, and Environmental[1] Technician ("HSE Tech") in Defendants' Midland location.

---

[1] Health, Safety, and Environmental ("HSE").

16. Plaintiff was a productive employee with no significant disciplinary history and was qualified for the positions he held and sought while employed by the Defendants.

17. While employed by Defendants, Plaintiff experienced severe or pervasive discrimination because he is African American (black) and not Latino.

18. Plaintiff was forced to endure constant and pervasive bullying that other, similarly-situated employees did not have to endure.

19. Plaintiff repeatedly reported this behavior to Human Resources and the ultimate decision-maker with regard to employment issues at Defendants' operations, Steve Villanueva.   Plaintiff's complaints of discrimination went ignored and the Defendants tolerated or condoned the situation.   On one of the instances when Plaintiff tried to discuss his concerns regarding racist treatment of African Americans with owner Steve Villanueva, Mr. Villanueva became irate, told Plaintiff that it was "[his] fucking company" and invited Plaintiff to resign.   Following Plaintiff's reports, the racist abuse toward Plaintiff escalated.

20. The discrimination suffered by Plaintiff and other African American employees of the Defendants was overt, blatant and specifically the type of conduct Title VII and the TCHRA were enacted to protect against and prevent.

21. Plaintiff began experiencing discrimination almost immediately after his employment with Defendants began.

22. In February 27, 2019, Plaintiff interviewed with John Garza, a recruiter for Defendants. During Plaintiff's interview, Mr. Garza told Plaintiff that he had the

experience needed for positions in either the "Safety"[2] or Department of Transportation ("DOT") divisions within Defendants' business operations.

23. Plaintiff's first date of employment with Defendants was March 6, 2019.  On that date, Gabriel Martinez, HSE Tech Manager[3], told Plaintiff that he "could not believe" the company had hired a black man and indicated that Plaintiff's opportunities for advancement would be limited because Plaintiff was not Latino. Plaintiff interpreted Mr. Martinez's disbelief about him being hired as commentary on upper management's discriminatory views of non-Latino employees, specifically those that were African American.

24. On March 21, 2019, Plaintiff was called a "Mayate" in Spanish by Defendants' head mechanic, Cesar Galache.  "Mayate" is a Spanish racist slur for African Americans and is extremely derogatory.  Defendants' mechanics also began to refer to Plaintiff as "Mayate."

25. In April of 2019, Plaintiff reported the racial slur that Mr. Galache and the mechanics were using to Sophenia Damron, a white female and the Human Resources Manager for Defendants at that time.  Ms. Damron informed Plaintiff that she was also experiencing racial discrimination at the company and was going to resign.  To Plaintiff's knowledge, no action was taken and the racial slurs continued.

26. Later in April 2019, Plaintiff spoke with Steve Villanueva, about an open Department of Transportation Manager ("DOT Manager") position.  When Plaintiff told Mr.

---

[2] "Safety" refers to the management of Defendants' safety and security initiatives, resources and compliance with regulations promulgated under the Federal Motor Carrier Safety Administration (FMCSA).
[3] Upon information and belief, Defendants also refer to this position as Safety Manager or HSE Manager.

Villanueva that he was interested in the position, Mr. Villanueva simply said "no," and walked off.  Upon information and belief, Steve Villanueva, is an owner and Chief Financial Officer for Defendants and the ultimate decision-maker for hiring and promotion decisions for Defendants.

27. In May of 2019, Plaintiff again reported Mr. Galache and the mechanics' continued use of racial slurs in in the workplace towards and around Plaintiff and other African American employees to Ms. Damron.  To Plaintiff's knowledge, no action was taken and the racial slurs continued.  However, as time moved on, Plaintiff began experiencing retaliation because of his complaints to Defendants' management about discrimination.  The discrimination and retaliation experienced by the Plaintiff were sufficiently severe or pervasive as to create a hostile work environment.  Plaintiff frequently heard racial slurs and epithets from his coworkers and supervisors in the workplace and Mr. Villanueva and others began being openly hostile to Plaintiff.

28. Jamie Dominguez, Supervisor for Fleet Division, overtly and repeatedly treated Plaintiff and other African American employees with racist abuse.

29. In May of 2019, Ms. Damron resigned her employment with Defendants.

30. In May of 2019, Mr. Martinez informed Plaintiff that he intended to resign and stated that he had informed upper management that Plaintiff was qualified for the Safety Manager position.  Mr. Martinez re-iterated his prior statement to Plaintiff that he "could not believe" the company had hired a black man and indicated that Plaintiff's opportunities for advancement would be limited because Plaintiff was not Latino. Mr. Martinez told Plaintiff he should apply for the HSE Tech Manager position, he

doubted the Plaintiff would be promoted. Mr. Martinez explained that Steve Villanueva told him that there was "no way a black man" would advance within the company and that Jose Meraz, a person Plaintiff believed to be the President and of the owners of the Defendants had expressed similar sentiments.

31. In May of 2019, Plaintiff inquired with another employee, Manny Rico,[4] as to whether or not the DOT Manager position was still available and open.  Mr. Rico stated that it was.  Plaintiff inquired because during this time period, due to his experience and knowledge in the area of DOT compliance, Plaintiff was assisting Natalie Navarrete (a Latina female), Recruiting Manager; and Violeta Navarrete (a Latina female), DOT Clerk; with all the DOT compliance paperwork and other DOT issues.  In other words, Plaintiff was already performing the DOT Manager job duties and directing the work of Natalie Navarrete and Violeta Navarrete.  Plaintiff met with Natalie Navarrete, Violeta Navarrete, and Mr. Villanueva to discuss the DOT manager position.  Natalie Navarrete and Violeta Navarrete recommended that Mr. Villanueva promote Plaintiff into the position since he was qualified and was already essentially supervising and managing their work.  Mr. Villanueva said that it was a special position and that Plaintiff didn't have the credentials necessary for the position.  Plaintiff asked Mr. Villanueva what the exact requirements were for the position and Mr. Villanueva said that he didn't know, but he knew Plaintiff wasn't

---

[4] Plaintiff does not know Manny Rico's official title or position with the Defendants.

the right person for the position.  Defendants ultimately hired Violeta Navarrete for the DOT Manager position.

32. On or about June 16, 2019, Gabriel Martinez's employment ended with Defendants. Plaintiff asked Steve Villanueva about being promoted to the HSE Manager position previously held by Mr. Martinez.  Mr. Villanueva stated that he had already hired someone for the position and that person would be starting the following Monday.

33. On or about June 17, 2019, Manny Maldonado (a Latino male) began his employment with Defendants as HSE Tech Manager.

34. On or about June 18, 2019, Plaintiff had a meeting with Manny Maldonado.  Mr. Maldonado informed Plaintiff that he could fire Plaintiff and upper management fully supported that.  Mr. Maldonado warned the Plaintiff that if he did not comply, he could "fly" and for Plaintiff to stay in his lane.  Mr. Maldonado made it clear that Mr. Villanueva had instructed Mr. Maldonado to get rid of the Plaintiff.

35. Thereafter, Plaintiff was subject to a higher workload than the other HSE Techs, who were Latino.  Plaintiff continued to frequently hear racial slurs and epithets from his coworkers and supervisors in the workplace.  Mr. Villanueva and others remained openly hostile to Plaintiff and began to exclude the Plaintiff from meetings all together.  When Defendants held safety meetings and other key business meetings, they solely spoke Spanish so Plaintiff would not be able to understand what was being discussed.  This made the performance of Plaintiff's job duties difficult in that Plaintiff was denied the information and resources to adequately perform his job duties.  It was clear that the Defendants were trying to push Plaintiff out.

36. In July of 2019, Plaintiff spoke to Mr. Maldonado about two HSE Technicians, Valentino Maldonado (Latino male) and Ricardo Rodriguez (Latino male), not pulling their weight.  Mr. Maldonado told Plaintiff not to worry about it, that he wasn't going to "work his son[5] like a slave."

37. Jaime Dominguez, Fleet Supervisor, overtly and repeatedly treated Plaintiff and the few other African-American employees with racist abuse, including blatantly racist actions.   For example, upon information and belief, Dominguez only required African-American applicants to do multiple evaluations, while all other applicants would only do one evaluation.  If the African-American applicants passed their evaluations, Dominguez would still not hire them. Plaintiff was in charge of notifying the new driver applicants if they were moving forward with the hiring process or if they would not be hired.  On one occasion, Antonio Escobedo, Truck Pusher, instructed Mr. Lydia not to hire a qualified African-American job applicant.  Mr. Escobedo said that he wanted to determine whether Mr. Lydia would be loyal to him or to the African-American applicant.

38. In August of 2019, Plaintiff approached Mr. Villanueva again about the DOT Manager position.   Mr. Villanueva laughed at Plaintiff and walked away. Mr. Maldonado informed Plaintiff later that day that Mr. Villanueva told him to have the Plaintiff stop asking about the DOT Manager's position, that there is no way a black man would be hired in a management position, and that if Plaintiff didn't stop, then

---

[5] Valentino Maldonado is Manny Maldonado's son.

he would be terminated.  Plaintiff complained to Ashley Dunn, Human Resources Manager, about the discriminatory statement and the threat of termination. Plaintiff's knowledge and belief, nothing was done in response to Plaintiff's complaints.

39. In December of 2019, the Defendants held their Christmas Party.  Jose Meraz and Nuvea Meraz were in attendance. and it was Plaintiff's understanding that they were some of the owners of the Defendants.  Mr. Meraz is believed by the Plaintiff to be the President of Defendants' business operation.  After the Christmas party, Mr. and Ms. Meraz met with Plaintiff in their hotel room.

40. Mr. Meraz told Plaintiff that he doesn't trust Mr. Maldonado and wants Plaintiff in the HSE Tech Manager position, but Mr. Villanueva and Greg Sooner, another owner and manager of Defendants, are prejudiced against Plaintiff and they do not want Plaintiff to have the position.  Jose Meraz specifically told Plaintiff that Mr. Villanueva has said that he did not want a black man running any department. Jose Meraz told Plaintiff that he and Ms. Meraz want to promote Plaintiff, to be the HSE Manager for both Defendants after Mr. Maldonado was no longer employed by Defendants.  Mr. Meraz told Plaintiff they would more immediately promote him to Safety Supervisor.

41. In January of 2020, after Mr. Meraz placed Plaintiff in the Safety Supervisor position, Mr. Villanueva informed Plaintiff that he was the "wrong hire" for that position and no matter what Jose Meraz or Nuvea Meraz said, Plaintiff was still not a supervisor.

42. In March of 2020, Mr. Maldonado was terminated.  Thereafter, Plaintiff had a meeting with Ms. Meraz.  Ms. Meraz told Plaintiff that he was now the new HSE

Tech Manager and gave him the keys to Mr. Maldonado's old office.  Ms. Meraz also ordered business cards for Plaintiff that reflected Plaintiff's new position to be "Safety Tech Manager."  Mr. Villanueva later called Plaintiff and informed him that that he would never be over the safety department and Plaintiff should call him before he makes any safety decisions.

43. Plaintiff began making all decisions regarding safety for Defendants and performing the job duties of HSE Tech Manager.  Mr. Villanueva continued to exclude Plaintiff in meetings where critical information and documents regarding Plaintiff's job duties were being discussed.  Mr. Villanueva made it clear Plaintiff was HSE Tech Manager in name only.

44. In August of 2020, Plaintiff complained to Ms. Vanessa Villasana, Human Resources Manager, that he was being treated differently and that Mr. Villanueva didn't like him because he was black.

45. In October of 2020, Plaintiff asked Mr. Villanueva for additional employees to assist him.  Mr. Villanueva repeatedly turned down the candidates the Plaintiff suggested and told Plaintiff that any potential candidates must have a commercial driver's license, Occupational Safety and Health Administration classes, five years safety experience, and that the rate of pay would be up to $16.50 an hour. Plaintiff informed Mr. Villanueva that he would not be able to find anyone with those credentials at that rate of pay. Mr. Villanueva temporarily transferred another employee to help Plaintiff, but that employee was shortly transferred to another department. Plaintiff

asked for days off and was told that he was the only one in the department and was asked how could he think of a day off.

46. At the end of October of 2020, Mr. Villanueva finally allowed Plaintiff to hire someone, but told Plaintiff that his job was on the line.  After the new employee started, Mr. Villanueva told Plaintiff that he had some help coming and for Plaintiff not to hire anyone else.

47. In January of 2021, Plaintiff was frustrated by Mr. Villanueva's lack of support. Plaintiff attempted to implement new procedures and policies, but was met with resistance at every turn.  Plaintiff suspected from Mr. Villanueva's behavior that Mr. Villanueva was actively trying to get him to resign by badgering, harassing, or humiliating him.   Mr. Villanueva would give Plaintiff conflicting instructions regarding the use of personnel from SAND REVOLUTION and Plaintiff's authority. These conflicting instructions inhibited Plaintiff's ability to perform his job duties and created an excessive workload for Plaintiff.  Mr. Villanueva vacillated between telling Plaintiff that he only had authority over FEVID employees and no authority or responsibilities with SAND REVOLUTION and telling Plaintiff he could use SAND REVOLUTION employees, and to accomplish tasks on behalf of SAND REVOLUTION and FEVID.  Plaintiff felt Mr. Villanueva was trying to set him up for failure by making it so difficult for him to perform his job duties.

48. In January of 2021, black drivers and some white drivers employed by the Defendants continue to complain to Plaintiff about the discriminatory treatment they were experiencing.

49. In January of 2021, Defendants informed Plaintiff that they were hiring Carlos Campos as the new HSE Tech Manager. This came as a shock to the Plaintiff. Plaintiff asked Mr. Villanueva where he fit in with the company. Mr. Villanueva told Plaintiff that Mr. Campos would decide Plaintiff's role and that Mr. Campos had been placed in charge of the Safety Department. Plaintiff then asked Mr. Campos where he fit in with the company. Mr. Campos told Plaintiff that Mr. Villanueva had told him to learn from the Plaintiff and then let him go. The discriminatory treatment and retaliation continued.

50. In April of 2021, Esteban Deleon, an African American employed by FEVID as a driver, complained to Plaintiff that he felt that Jaime Dominguez discriminated against because of his race/color. Plaintiff went with Mr. Deleon to Mr. Villanueva's office and reported Mr. Deleon's complaints of racism. Mr. Villanueva said, "that kind of behavior is not allowed;" "that everyone will be treated equal;" and, assured Mr. Deleon that he would investigate the complaint against Mr. Dominguez and that there would not be any retaliation.

51. April 12, 2021, Plaintiff sent Ms. Villasana an email asking if any actions were taken with regard to Mr. Deleon's complaints of discrimination. Ms. Villasana replied that she didn't know anything about the issue.

52. On April 14, 2021, Ms. Villasana sent Plaintiff an email requesting that the Plaintiff come to her office to discuss the discrimination issue raised by Mr. Deleon.

53. On April 15, 2021, Plaintiff met with Ms. Villasana and she informed Plaintiff that Defendants were giving Mr. Dominguez another chance and if he made another

mistake then he'd be written up. Plaintiff informed Ms. Villasana that he did not want to work with another employee who believed that he was above black people and that he could treat them less than the Hispanic employees; that Plaintiff did not want to be around him and didn't understand why the company kept him on; and, that he didn't believe the company made the right move.

54. On April 17, 2021, Plaintiff attended a job fair with Mr. Villanueva and Mr. Dominguez.  Plaintiff worked with Mr. Dominguez when necessary, but did not feel comfortable doing do.   Mr. Villanueva and Mr. Dominguez kept making snide comments to the Plaintiff like "Where are you going James?" "You have help" "Slow down."  They openly laughed at Plaintiff.  Plaintiff decided at this point that any complaints to Mr. Villanueva and the Defendants' human resources representatives became wasted motion and it was objectively obvious that the Defendants had no real intention of stopping the ongoing, blatant racial harassment and discrimination. Plaintiff felt compelled to resign his position due to the badgering, harassment, or humiliation by Defendants calculated to encourage his resignation.

55. On April 19, 2021, based on the pervasive, persistent, abusive, retaliatory, harassing and racist behavior throughout the company toward African Americans– and Defendants' refusal to take any corrective action – Plaintiff was compelled to resign. Defendants' failure to take any remedial action and the pervasive discriminatory culture promoted by Defendants' constructively discharged Plaintiff.

# IV.
## CAUSES OF ACTION

### Count 1: Discrimination in Violation of Title VII and TCHRA
### (Hostile Work Environment)

56. Mr. Lydia incorporates paragraphs 1-55, *supra*, as if repeated verbatim.

57. Defendants are employers within the meaning of Title VII and the TCHRA.

58. Plaintiff was an employee within the meaning of Title VII and the TCHRA at all times relevant to his complaint.

59. Plaintiff, an African American (black) employee, belongs to a class protected under Title VII and the TCHRA.

60. Plaintiff was subject to unwelcome harassment that was based upon Plaintiff's race, color and/or national origin.

61. The harassment complained of herein affected a term, condition or privilege of employment.

62. Defendants knew or should have known of harassment in question and failed to take prompt remedial action.

### Count 2: Racial Discrimination in Violation of Title VII and TCHRA
### (Failure to Promote)

63. Mr. Lydia incorporates paragraphs 1-55, *supra*, as if repeated verbatim.

64. Defendants are employers within the meaning of Title VII and the TCHRA.

65. Plaintiff was an employee within the meaning of Title VII and the TCHRA at all times relevant to his complaint.

66. Plaintiff, an African American (black) employee, belongs to a class protected under Title VII and the TCHRA.

67. Plaintiff was subject to unwelcome harassment that was based upon Plaintiff's race, color and/or national origin.

68. The harassment complained of herein affected a term, condition or privilege of employment.

69. Defendants knew or should have known of harassment in question and failed to take prompt remedial action.

### Count 3: Retaliation
### in Violation of Title VII and TCHRA

70. Mr. Lydia incorporates paragraphs 1-55, *supra*, as if repeated verbatim.

71. Title VII and the TCHRA prohibit discrimination on the basis of race, color, and/or national origin in employment.

72. Defendants are employers within the meaning of Title VII and the TCHRA.

73. Plaintiff was an employee within the meaning of Title VII and the TCHRA and at all times relevant to his complaint.

74. Title VII and TCHRA prohibit retaliation against employees who oppose or report employment practices made unlawful thereunder.

75. Plaintiff engaged in protected activity under Title VII and TCHRA by making an internal race, color, and/or national origin discrimination complaint, opposing the foregoing discrimination in the workplace, and requesting the employer take corrective action. Plaintiff engaged in this activity in good faith.

76. Plaintiff suffered adverse employment actions as a result of his protected activity including, but not limited to, slurs, workplace hostility, denials of promotions, and the eventual termination of his employment.

77. A causal connection exists between Plaintiff's protected activity and Defendants' adverse employment actions, including the termination of Plaintiff's employment.

78. Defendants retaliated against Plaintiff intentionally and with reckless disregard to his rights under Title VII and the TCHRA.

79. Defendants' unlawful retaliation caused Plaintiff economic and non-economic harm, as set forth below.

**Count 4:  42 U.S.C. § 1981 Race Discrimination**

80. Plaintiff re-alleges paragraphs 1-55, *supra*, as though fully set forth herein.

81. 42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts, including the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges and conditions of the contractual relationship.

82. Defendants intentionally discriminated against Plaintiff because of his race in violation of 42 U.S.C §1981 by singling him out for a write up because of his race.

83. Plaintiff was subject to an adverse employment action.

84. Plaintiff was treated less favorably than other similarly-situated employees who were not in his protected class.

85. As a direct and proximate cause of Defendant's actions as alleged herein, Plaintiff has been damaged.

86. If it had not been but-for Plaintiff's race, Defendants would not have singled him and other African-Americans out for a write up.

87. Defendants' retaliation against Plaintiff occurred because Defendants had opposed racial discrimination. If Plaintiff had not complained of racial discrimination, Defendants would not have terminated him.

88. Plaintiff's race was the but-for cause of Defendants' violation of Plaintiff's rights and Plaintiff's injuries.

89. Defendants' conduct is so egregious as to warrant the imposition of punitive damages.

### Count 5:  42 U.S.C. § 1981 Retaliation

90. Plaintiff re-alleges paragraphs 1-55, *supra*, as though fully set forth herein.

91. 42 U.S.C. § 1981 prohibits retaliation based on complaints of racial discrimination in the making and enforcing of contracts, including the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges and conditions of the contractual relationship.

92. Section 1981 (42 U.S.C. §1981) was amended by the Civil Rights Act of 1991 to create a cause of action for retaliatory conduct occurring after the formation of a contract.

93. Plaintiff participated in an activity protected by 42 U.S.C. §1981.

94. Defendants took an adverse employment action against Plaintiff by terminating his employment after he voiced complaints of racial discrimination to Defendants.

95. A causal connection exists between Plaintiff's complaints of racial discrimination and the Defendants' termination of Plaintiff's employment.

96. Plaintiff's complaint of racial discrimination was the but-for cause of his termination.

97. Defendants' conduct is so egregious as to warrant the imposition of punitive damages.

## V.
## DAMAGES

98. As a result of Defendants' unlawful conduct, Plaintiff has suffered economic damages, including past and future lost income, interest on back and front pay, lost earning capacity in the past and future, lost benefits under the contract or employment relationship, job search expenses, injury to his credit standing, and other consequential and incidental financial damages.

99. Plaintiff has also incurred other compensatory and actual damages as a result of Defendants' unlawful conduct, including emotional pain and suffering, mental anguish, loss of enjoyment of life injury to professional standing, injury to character and reputation and other non-pecuniary losses.

100.    Defendants acted in reckless disregard to Plaintiff's rights to be free from discrimination based on race, color, and/or national origin, and unlawful retaliation and intentionally engaged in an unlawful employment practice by discriminating and retaliating against Plaintiff.

101.    Defendants' oppressive and/or malicious conduct calls for the imposition of compensatory and punitive damages under 42 U.S.C. § 1981a, Title VII, and TEX.

LAB. CODE § 21.2585(d) in an amount sufficient to deter Defendants from engaging in such acts of discrimination and retaliation in the future.

## VI.
## ATTORNEY'S FEES

102.     A prevailing party may recover reasonable attorneys' and experts' fees under Title VII, Section 1981, and TCHRA.

103.     Plaintiff seeks all reasonable and necessary attorneys' fees and expert witness fees in this case from Defendants.

104.     Plaintiff additionally seeks recovery of all costs associated with the prosecution of this action.

## VII.
## JURY DEMAND

105.     Plaintiff demands a trial by jury of all the issues and facts in this case.

## VIII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that:

The Court assume jurisdiction of this case and that Defendants be cited to appear;

The Court award Plaintiff economic, compensatory, and punitive damages as specified above;

The Court award Plaintiff the equitable remedy of reinstatement or, in the alternative, front pay;

The Court award Plaintiff his reasonable attorneys' and expert fees and costs;

The Court award Plaintiff pre- and post-judgment interest at the highest rates allowed; and

The Court award Plaintiff any such other relief as the Court may find proper, whether at law or in equity.

Respectfully submitted,

**ROSS SCALISE LAW GROUP**
1104 San Antonio Street
Austin, Texas 78701
(512) 474-7677 Telephone

*/s/ Megan E. Evans*
**Megan E. Evans**
Texas Bar No. 24090092
mevans@rosslawgroup.com

**DANIEL B. ROSS**
Texas Bar No. 789810
dan@rosslawgroup.com

**ATTORNEYS FOR PLAINTIFF**